**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **ESSEX INSURANCE CO.,** | |
| **Plaintiff,** | **MEMORANDUM DECISION** |
| **v.** | **AND ORDER** |
| **WAKE UP TOO, INC.  dba LIQUID JOE'S, and WESLEY RIGBY,** | **Case No.  2:07CV312 DAK** |
| **Defendants.** | |

This matter is before the court on Essex Insurance Company's ("Essex") Motion for Summary Judgment.   A hearing on the motion was held on December 3, 2008.   At the hearing, Essex was represented by Gary L. Johnson.  Defendants Wake Up Too, Inc. dba Liquid Joe's ("Liquid Joe's") and Wesley Rigby ("Mr. Rigby") (collectively referred to as "Defendants") were represented by Charles A. Gruber.   Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking the motion under advisement, the court has further considered the law and facts relating to the motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

## I.  INTRODUCTION

This is a declaratory judgment action in which Essex seeks a determination

concerning its obligations and duties under a commercial general liability insurance contract issued to Liquid Joe's.  Mr. Rigby claims that he suffered significant bodily injuries as a result of an encounter with certain security guards at Liquid Joe's in the early morning hours of February 29, 2004.  Mr. Rigby filed a lawsuit against Liquid Joe's in the Third Judicial District Court, State of Utah (the "Underlying Lawsuit").  Liquid Joe's tendered the defense of the Underlying Lawsuit to Essex.  Essex evaluated the potential for coverage, issued a reservation of rights letter, commenced defense of Liquid Joe's under the reservation of rights, and filed this declaratory judgment action.  As described below, Essex has demonstrated that summary judgment should be granted in its favor based on the assault and battery exclusion in the policy.

## II. BACKGROUND FACTS[1]

### A.     The Events of February 28, 2004

At approximately 10:00 p.m. on the evening of February 28, 2004, Mr. Rigby went to the private club, Liquid Joe's.  When he arrived at Liquid Joe's, he discovered that he had forgotten his wallet and traveled back to his home to retrieve the wallet.  While at home, he consumed one shot of some kind of liquor.  After Mr. Rigby retrieved his

---

[1] While the parties have different perceptions of what happened on the evening on February 28, 2004, these discrepancies do not preclude the court, in this case, from making a determination as a matter of law regarding the applicability of the insurance policy.

2

wallet, he traveled back to Liquid Joe's and arrived at approximately 11:00 p.m.  Shortly after he entered Liquid Joe's, Mr. Rigby was asked by Liquid Joe's security to leave the premises.

After Mr. Rigby was escorted out of Liquid Joe's, he went to the van of his friend, Eric Freed, which was located in the parking lot of Liquid Joe's.  He waited outside Liquid Joe's for approximately two to two-and-a-half hours before his friends came out. The first of his friends to exit Liquid Joe's was Mike Cummings, who, when he came out of Liquid Joe's, was angry that Mr. Rigby had been kicked out.
When Mr. Cummings exited Liquid Joe's, he yelled at the Liquid Joe's security guards. When he saw this, Mr. Rigby asked his friend, Mr. Freed, to take Mr. Cummings to the car to avoid an altercation between Mr. Cummings and the security guards.   Mr. Cummings' car was parked in the Harmon's grocery store parking lot.

Liquid Joe's security personnel recall the next series of events somewhat differently than Mr. Rigby.   Ryan Smith, an employee of Liquid Joe's, testified at his deposition:

Q      . . . . Just give us a narrative of what happened next.

A.     They started to walk in an easterly fashion.  As we were
       following them, they came back in kind of a confrontational manner, still
       arguing. And it was just kind of an escort. No confrontation or no contact
       with any of them had taken place at that time. We got them to the east –
       Mike [Cummings] and April [Rigby] were ahead of Wes [Rigby]. Wes kept
       turning around arguing and then he would walk a little bit further, turn

3

around, argue, walk a bit farther. As soon as we got to the edge of that property line is when we said, "Have a nice night."  At that particular time, Mr. Rigby turned around and came at me with a gesture with closed fists in a manner that I felt was aggressive.

* * *

Q.    And as best you recall, step-by-step what happened after he turned and had his clenched fist, as you recall?

A.    As he turned with his fists clenched, I perceived that as a  threat and figured he was going to either strike me or take me down to the ground, so I didn't want that to happen.  So that's when I, with one closed fist with the right hand, hit Mr. Rigby in the face as to alleviate him coming after me to hit me.

Q.    Do you remember where you hit him in the face?

A.    Directly, I believe, in the nose.

Q.    And what happened when you hit Wes in the nose with your fist?

A.    Wes and I started to kind of become entangled. He grabbed  onto my shirt and I had a hold of his shirt. It seemed like he was still trying to get at me. As that happened, Jeff Vincent came in and tried to pull Wes from me. And I think we both kind of slipped down to our knees.

Q.    Now, do you recall how many times you hit Wes?

A.    I think it was two to three times with a closed fist on the right side of the face.

Mr. Rigby, however, recalls that he, Mr. Cummings, and Mr. Rigby's sister, April, were

walking away from Liquid Joe's with their backs to the security guards.   According to

Mr. Rigby, his sister asked the Liquid Joe's security guards who were following them to

leave them alone.  Then, one of Liquid Joe's security guards charged in her direction.

4

When the Liquid Joe's security guard charged at Mr. Rigby and his sister, they were right on the line between Liquid Joe's and the Harmon's grocery parking lot.   Mr. Rigby pulled his sister behind him and turned to look back at the security guard.  According to Mr. Rigby, he was grabbed by two Liquid Joe's security guards, pushed to the ground, and punched and kicked.  Mr. Rigby testified:

Q.   So you had two guards push you down. You are not sure who they were?

A.   No, I never got turned around to look at their faces. I never saw their faces until I was like being pushed to the ground, just thrown to the ground.

Q.   Okay. What happened next?

A.   When I went down, they just started punching and kicking me.

Q.   You hadn't thrown a punch?

A.   No, I had not raised my hand.

Q.   You hadn't grabbed anyone?

A.   No, on the way down, I went and I was – there's a curb – if you ever go to Liquid Joe's, there's a curb where it goes from there to Harmon's. They pushed me and I tripped – they were pushing me down. I fell down and I'm almost going to hit my head and I grabbed – I reached up to grab something so I wouldn't smash my head into the pavement and they just began kicking and punching me, I believe it was the guy.

* * *

5

Q.      Had you been punched at that point?

A.      One of the guys got me, put me in a headlock almost immediately.

Q.      Before you went down?

A.      Like immediately when I'm down. One came around, got me in a headlock while two were on the front of me. And at that time I was being punched in the face. I had been punched right here and my lip was bleeding and my nose was bleeding (indicating). So I got punched at least three times in the face.

Q.      Who was punching you in the face?

A.      One of the two that pushed me down. Before I even hit the ground I was already getting punches. And then I turned in kind of a defending mode to try to not get hit in the face and I got put in a headlock and one of – I believe it was Ryan, my sister was right there, she saw everything, and she was sober and she was just – she told me it was Ryan – they all had name badges on – he was the one that gave me head trauma because he was punching me.  I was in a headlock and he was punching me with full force, lifting his fist up as high as he could and coming down hitting my head so hard that my sister said it sounded like a brick wall was being – was being punched.

Q.      Did he hit you in the nose?

A.     In the same spot over and over and over.

When Mr. Rigby was pushed down, it was on the Harmon's side of the property line.  Mr. Rigby recalls that while he was being punched and kicked by the Liquid Joe's security guards, he was going in and out of consciousness.  When he regained consciousness while he was being held by the Liquid Joe's security guards, he saw a light from a police car.   After he saw the police lights, he remembered the Liquid Joe's security guards letting him go and that he dropped to the ground.  He was bleeding from his nose and his mouth.  The Salt Lake City Police Department investigated the fight between Mr. Rigby and the security guards at Liquid Joe's, but no charges were filed by the Salt Lake City Police Department against any Liquid Joe's employees because of the fight.

With respect to the conditions of the Liquid Joe's parking lot and the conditions of the area where the altercation took place between Mr. Rigby and the Liquid Joe's security personnel, Ryan Smith, testified as follows:

Q.     In some of the statements I see some descriptions of six inches of snow. I can't remember whose statement it was. What do you recall the amount of snow that was out there in the area where the altercation occurred?

A.     That was their parking lot, the one shared with Harmon's and Einstein Brothers and I believe there's a Blockbuster Video there as well. The night was clear when we started working. During the night there was a heavy,

heavy snowstorm.

Q.     Did anybody go out into the parking lot of Liquid Joe's and shovel the snow

        that night, that you recall?

A.     One of our staff members had actually shoveled the sidewalks that lead to

        the front door.  I'm not sure who it is that does it, but there was a small

        pickup truck with a plow that had come through and had removed some of

        the snow in the area.

Q.     Do you remember what time of night that was?

A.     No.  We had shoveled periodically throughout the night and gone out and

        salted the sidewalk. That was our staff that had done that. I can't recollect

        the time of the plow.

* * *

Q.     And when you and [Mr. Rigby] went down to your knees, do you recall

        slipping when you went down to your knees?

A.     No, I think just the force of that, he had a hold of my shirt and then Jeff

        coming over to try to pull him from us, I think it was just the weight

        momentum rather than slipping.

Q.     Do you recall – I can't remember which one, but one of the statements talk

        about that they didn't think [Mr. Rigby] had been hurt in the fall because

        there was six inches of snow that would have broken his fall or words to

that effect. Do you recall that much snow being on the ground?

A.      There was quite a bit. It was padded. I remember being on my knees and

        going down with force, but not coming up – coming up unscathed. I didn't

        have any pain in my knee. There was no damage to the outer garments of

        my clothing.

**B.      The Underlying Lawsuit**

In November of 2004, Mr. Rigby filed the Underlying Lawsuit against Liquid

Joe's.  In October of 2006, Mr. Rigby filed his Second Amended Complaint ("SAC").

The Second Amended Complaint alleges that Mr. Rigby was at Liquid Joe's with his

sister and some friends and later in the evening, Mr. Rigby was dancing and "was

negligently physically bumped and hit by a patron on the dance floor. . ."  Security

personnel, apparently mistakenly believing that Mr. Rigby had caused the problem, asked

him to leave which he did peacefully.

 Mr. Rigby remained outside of Liquid Joe's while his friends remained inside

"drinking alcohol supplied by the Defendants."  As the establishment began to close

down, one of Mr. Rigby's friends, who was intoxicated, became involved in a verbal

argument with one of the Liquid Joe's security personnel.  Mr. Rigby's version of events

in the SAC are that members of Mr. Rigby's party were trying to escort their friend off

the premises when the Liquid Joe's "security persons continued in a negligent manner to

attempt to restrain and remove the intoxicated persons."

According to Mr. Rigby's SAC, the Liquid Joe's security employees, because of

their lack of training in restraining and removing intoxicated persons, negligently attempted to restrain or remove all of plaintiff's party, including plaintiff.   As a result of Defendant's negligence, Mr. Rigby was knocked semi-conscious and physically injured.

Mr. Rigby has settled his dram-shop type claims with another insurance carrier, and the parties agree that only the First and Fifth Cause of Action are at issue in the instant lawsuit.  These two claims pertain to premises liability (First Cause of Action) and negligent infliction of emotional distress (Fifth Cause of Action).

Specifically, the First Claim for Relief in the SAC is titled "Negligence and Premises Liability – Against All Defendants."   This claim pertains to Defendants serving people alcohol who were already intoxicated (which is no longer relevant), and it also alleges that:

¶ 43.   On or about February 29, 2004, the Defendants were or reasonably should have been aware that they had failed to employ, train and supervise their security employees to provide safe and adequate security on the premises including, removing and/or restraining intoxicated and boisterous persons or any person in a safe manner thereby creating a dangerous condition.

¶ 44.   On or about February 29, 2004, the Defendants were or reasonably should have been aware that snow and ice were building up in the parking lot and that the snow and ice had not been removed during the evening thereby creating a dangerous condition for the patrons of the Defendants including the Plaintiff.

¶ 45.   The Defendants and each of them breached their duties that they

owed to Mr. Rigby by, including, but not limited to, negligently maintaining

the premises so as to create a dangerous and unsafe condition, failing to

remedy the dangerous condition in a prompt manner, failing to warn Mr.

Rigby and others concerning the unsafe and dangerous conditions; failing to

adequately train its employees on how to safely maintain the premises;

failing to provide security and crowd control to the patrons on the premises;

and failing to properly supervise its security employees to ensure that those

employees maintain the premises in a safe condition including restraining

and/or removing persons from the premises in a safe manner that did not

endanger other patrons on the premises and not harming patrons on the

premises.

The Fifth Claim for Relief is for negligent infliction of emotional distress.

This claim relates to the alleged poor training and negligent supervision of the security

guards and that this alleged poor training and negligent supervision led the Liquid Joe's

security guards to a negligent choice of the use of certain security techniques that caused

Rigby physical injury.

**C.      The Essex Contract of Insurance**

Essex issued a commercial general liability insurance contract, Policy Number

3CM0534, to Liquid Joe's with a policy period from 12/09/2003 to 12/09/2004.  The

Policy is an occurrence-based policy with a $2 million general aggregate limit and a $1

million each occurrence limit which contract of insurance contains a standard ISO

Commercial General Liability Coverage Form ("CG 00 01 01 96, hereinafter "CGL

Coverage Form").  The Insuring Agreement in the Policy provides that Essex will pay

those sums that Liquid Joe's becomes legally obligated to pay as damages because of

"bodily injury" or "property damage" to "which this insurance applies."   Essex has "the

right and duty to defend the insured against any 'suit' seeking those damages."

The insurance applies to "bodily injury" only if the "bodily injury" is

caused by an "occurrence" that takes place in the coverage territory and occurs during the

policy period.  *Id.*  "Occurrence" is defined as an "accident, including continuous or

repeated exposure to substantially the same general harmful conditions."

The CGL Coverage Form contains a number of exclusions.  Exclusion "a" is

entitled: "Expected or Intended Injury."   This exclusion states that the insurance does not

apply to "bodily injury" or "property damage" that is "expected or intended from the

standpoint of the insured.  This exclusion does not apply to 'bodily injury' resulting from

the use of reasonable force to protect persons or property."  Importantly, this second

sentence of Exclusion "a" in the CGL Coverage Form has been *deleted* by two different

endorsements to the Policy.[2]

The Policy also contains Endorsement M/E/024(N/00), an "assault and/or battery"

exclusion.  This endorsement provides as follows:

---

[2]  Essex does not rely on the "Expected or Intended Injury" exclusion in this
motion.

The coverage under this policy does not apply to any claim,
suit, cost or expense arising out of assault and/or battery, or
out of any act or omission in connection with the prevention
or suppression of such acts, whether caused by or at the
instigation or direction of any Insured, Insured's employees,
patrons or any other person. Nor does this insurance apply
with respect to any charges of allegations of negligent hiring,
training, placement or supervision. Furthermore, assault
and/or battery includes "bodily injury" resulting from the use
of reasonable force to protect persons or property. The
sentence "this exclusion does not apply to 'bodily injury'
resulting from the use of reasonable force to protect persons
or property" is deleted from the Commercial General Liability
Coverage Form Section I, Item No. 2, Exclusions a.

## III.  DISCUSSION

A.    **Was There an "Occurrence" Under the Policy?**

Essex contends that the insurance policy doesn't apply because there was no

"occurrence" – defined as an "accident"– at issue here.    Essex argues that in *N.M., ex*

*rel. Caleb v. Daniel E.,* 175 P.3d 566 (Utah 2008), the Utah Supreme court clarified how

to analyze an "accidental" event.   In *Caleb*, the Utah Court determined that there are two

independent methods by which bodily injury or property damage may be deemed

"nonaccidental" in Utah, only one of which is relevant in this case.   Essex claims that,

under *Caleb*,  the harm or damage is not accidental if it is the natural and probable

consequence of the insured's act or should have been expected by the insured.  It further

contends that this court may decide as a matter of law what the average individual would

expect to happen under the circumstances.  *Id*. at 569-70.

In the instant case, Essex argues that the court should look to whether Mr. Rigby's

injuries–rather than the actions of the security guards–were accidental.  Then, according

to Essex, the court should evaluate whether the injures suffered by Mr. Rigby were disproportionate to the injury intended or what should have been reasonably expected, from the standpoint of the security guards.  Only if the injury is completely disproportionate to the injury reasonably expected should the court consider the event to be accidental in nature.

Essex then argues that regardless of whether the court credits the story of Mr. Rigby and his friends–or the story told by Ryan Smith, the Liquid Joe's security guard–the injuries were proportionate to the injury that the security guards should have reasonably expected.  Even Ryan Smith's account establishes that he struck Mr. Rigby in the fact at least three times.  According to Essex, no reasonable person could find that the long-term injuries (closed head trauma) resulting from such blows – particularly when the individual does not have their hands up to impede the blow – are disproportionate to the injuries that were reasonably foreseeable by the security guard.   Thus, Essex contends, Defendants have not established that the injuries resulted from an "accident," and the policy does not apply.

The court disagrees with Essex on this point, and finds that the court cannot, as a matter of law, conclude that the injuries were proportionate to the injury that the security guards should have reasonably intended or expected.  In other words, the court cannot, on a motion for summary judgment, conclude that there was no "occurrence" covered by the policy.  Thus, the court must next determine whether any of the exclusions preclude coverage.

**B.** __ **Does the Assault and Battery Exclusion Bar Coverage?** __

Essex next contends that if the court determined that Rigby's claims against Liquid

Joe's are caused by "an occurrence," then there are exclusions in the policy that bar

coverage for Rigby's claims.   Essex argues that in analyzing the application of Essex's

assault and battery exclusion to the claims brought by Rigby, it is important to focus on

four factors:

1.    The exclusion provides that coverage under the Essex policy does not apply

to any claim or suit "arising out of" assault and/or battery, or any act or

omission in connection with the prevention or suppression of such acts.

2.    The exclusion bars coverage for assault and/or battery or the prevention or

suppression of such acts, whether caused by or at the instigation or direction

of any of the Liquid Joe's employees, the patrons (that would be Rigby, his

friends and family) or any other person.

3.    The policy specifically bars coverage concerning any charges or allegations

"of negligent hiring, training, placement or supervision."

4.    The exclusion applies to bodily injury that results from the use "of

reasonable force to protect persons or property."

Utah courts have specifically provided a framework for interpreting the phrase

"arising out of" as used in liability insurance contracts.   In *Meadow Valley Contractors,*

*Inc. v. Transcontinental Ins. Co.*, 27 P.3d 594 (Utah Ct. App. 2001), the Utah Court of

Appeals analyzed the meaning of  the phrase, "arising out of" under Utah law:

The term 'arising out of' is ordinarily understood to mean originating from, incident to, or in connection with the item in question."

". . . As used in a liability insurance policy, the words 'arising out of' are very broad, general and comprehensive. They are commonly understood to mean originating from, growing out of or flowing from, and require only that there be some causal relationship between injury and the risk for which coverage is provided."

27 P.3d at 597 (quoting *Viking Ins. Co. of Wis. v. Coleman*, 927 P.2d 661, 663 (Utah Ct. App. 1996) (quoting *National Farmers Union Prop. & Cas. Co. v. Western Cas. & Sur. Co.*, 577 P.2d 961, 963 (Utah 1978)).   The Utah Court of Appeals went on to state that the phrase "arising out of" is equated with origination, growth or flow from the event, and has much broader significance than "caused by."  *Id.*

Therefore, if a claim against Liquid Joe's "arises out of" violent actions by Liquid Joe's employees, Liquid Joe's customers, or even bystanders, and whether the claim arises out of an affirmative assault or acts which are done in self-defense (as the Liquid Joe's employees claim), then coverage for any such claim is barred.

Mr. Rigby, through, argues that he did not use the term "assault and battery" in the Complaint, he does not assert a claim for "assault and battery," and his claims are all negligence-based.  Thus, he contends that this exclusion does not apply.

Courts, however, have routinely applied and upheld the assault and battery exclusion, even when the words "assault" and/or "battery" were not used in the Complaint and the plaintiff framed his claims in terms of negligence.  *See, e.g.*, *Gilmore v. Beach House, Inc.*, 174 P.3d 439 (Kan. 2008) (under Kansas law, "[a]n assault and

16

battery exclusion clause is intended to exclude all claims arising out of an assault and battery," even negligence claims); *Trainwreck West, Inc. v. Burlington Ins. Co.*, 235 S.W.3d 33 (Mo. Ct. App.  2007) (assault and battery exclusion of nightclub's commercial general liability policy barred coverage for patron's personal injury lawsuit); *Kamaki Skiathos,Inc. v. Essex Ins. Co.*, 396 F. Supp. 2d 624 (D. Md. 2005) (dismissing multiple lawsuits and concluding that the allegations described the use of physical force by bouncers against the plaintiffs, thus invoking the assault and battery exclusion, even though claims were couched as negligence claims); *Capital Indemn., Inc. v. Brown*, 581 S.E.2d 339 (Ga. Ct. App. 2003) ("but for" the assault, the plaintiff would not have a cause of action and thus his claims fall within the exclusion); *Capitol Indemn. Corp. v. Blazer*, 51 F. Supp. 2d 1080, 1086-88 (D. Nev. 1999) (none of plaintiffs' claims – including negligence – could have arisen absent the commission of the tortious assault and battery and exclusion applied to bar coverage); *Mt. Vernon Fire Ins. Co. v. Creative Housing, Ltd.*, 93 F.3d 63, 66 (2nd Cir. 1996) (because the plaintiff would be unable to maintain claims for negligence "but for" the assault upon her, under New York law, her claims were based on assault and battery and were therefore excluded from coverage under the insurance policy); *United Nat. Ins. Co. v. Entertainment Group, Inc.*, 945 F.2d 210 (7th Cir. 1991) (coverage precluded for suit by customer sexually assaulted in theater even though complaint stated claims sounding in negligence for insured's alleged failures in supervising and providing security; claims "arose out of" assault and battery); *Stinglich v. Tracks, D.C., Inc.*, 721 F. Supp. 1386 (D.D.C. 1989) (insurance policy did not

apply regardless of negligence allegations, the original cause of harm arose from an alleged assault and battery).

In this case, the testimony of Mr. Rigby, his sister, and his friends all describe a severe pummeling of Mr. Rigby by Liquid Joe's security personnel.  The testimony of the security personnel is that they thought they were suppressing or preventing the occurrence of an attack on them and, as Ryan Smith testified, he punched Mr. Rigby three times in the face to keep such an attack from occurring.  Regardless of why the altercation occurred or who was at fault, Mr. Rigby's claims–although styled as "negligence" claims–necessarily arise out of an assault or battery.  Under either version of the facts at issue, Mr. RIgby would not have a cause of action but for the alleged assault and battery, and therefore, his claims are excluded by the Essex insurance policy.

Defendants contend, however, that Essex is attempting to have this federal court ignore the Utah Supreme Court's decision in *Benjamin v. Amica Mutual Insurance Co.*, 140 P.2d 1210 (Utah 2006).   According to Defendants, the Utah Supreme Court ruled in *Benjamin* that "where there is a claim for negligence that is based on some intentional conduct that might otherwise be excluded, then the insurance carrier has a duty to defend and to indemnify the negligent infliction of emotional distress claim.   The court finds, however, that *Benjamin* does not stand for the proposition that an insurer has a duty to defend and indemnify a negligent infliction of emotional distress claim that arises from an excluded assault and battery.

To the extent Mr. Rigby claims that the conditions of the parking lot contributed to

or caused his injury, there is no testimony whatsoever of any injury from a "slip and fall"

suffered by Mr. Rigby that does not arise out of the alleged assault and battery.  Indeed,

there is no evidence of any "slip and fall" injury whatsoever.  Rather, there is merely an

allegation made in the Second Amended Complaint.   No sworn testimony has been

marshaled that could create a disputed fact on this point.   There is nothing in the police

report reflecting any statements by Mr. Rigby that he slipped and fell in the parking lot.

None of his deposition testimony indicates that he slipped and fell because of snowy or

icy conditions in the parking lot or walkways of Liquid Joe's.  No witness testified that

Mr. Rigby slipped and fell on the walkways at Liquid Joe's or in the parking lot of Liquid

Joe's as a result of any accumulation of ice or snow on the night of this incident.

Moreover, the cumulative testimony of the eyewitnesses is that the incident itself took

place in the Harmon's parking lot, adjacent to Liquid Joe's.   Liquid Joe's has no duty in

any event to maintain the parking lot of Harmon's.

Thus, the court finds that the assault and battery exclusion in the Essex insurance

policy precludes coverage for the injuries suffered by Mr. Rigby on the night in question,

regardless of the characterization of Mr. Rigby's claims.   Mr. Rigby's claims all arise

from the alleged assault and battery and would not exist "but for" the alleged assault and

battery.  Accordingly, Essex has no duty to defend or indemnify Liquid Joe's in the

Underlying Lawsuit.

### IV.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Essex's Motion for Summary

Judgment [Docket # 26] is GRANTED.  The assault and battery exclusion contained in the Essex Insurance Policy bars coverage for all of the negligence claims in Mr. Rigby's Second Amended Complaint, filed in the Underlying Action.   This action is therefore DISMISSED with prejudice, and the case is now closed.

DATED this 12th day of February, 2009.


BY THE COURT:

DALE A. KIMBALL
United States District Judge